[No. 26857. Department Two. March 29, 1938.]

OCCIDENTAL LIFE INSURANCE COMPANY, *Appellant,* v. MABEL FIERO MAY *et al., Defendants,* NORTHWESTERN FRUIT EXCHANGE *et al., Respondents and Cross-appellants.*[1]

*D. V. Morthland* and *Lane Morthland,* for appellant.

*D. A. Shiner* and *R. D. Kendall,* for respondent and cross-appellant Northwestern Fruit Exchange.

*Chas. A. Johnson,* for respondents and cross-appellants Blackman *et al.*

[1]Reported in 77 P. (2d) 773.

MILLARD, J.—An Indian, Loupe Loupe Charley, and his heirs owned a tract of land—an Indian allotment— at the mouth of the Loupe Loupe creek, in Okanogan county, to which tract had been decreed by the Federal court, March 18, 1921, fifty miner's inches of water under a six-inch pressure for irrigation from Loupe Loupe creek.

On August 1, 1923, the United States department of interior entered into a contract with Walter May for sale of the allotment of Loupe Loupe Charley to Walter May for a consideration of $21,000, of which $5,250 was paid contemporaneous with the execution of the memorandum of sale; the balance of $15,750 payable in three equal annual installments thereafter. That agreement provided that, upon default by May in payment of any of the installments or the interest thereon, forfeiture could be claimed.

May had certain water rights for his tract of land, which were insufficient. He applied to the plaintiff's assignor and was granted a loan of ten thousand dollars, which was later increased to fifteen thousand dollars. Of the $5,250 paid by May as a first installment for the purchase of the Indian allotment and water right, $3,150 was a part of the loan to May by plaintiff's assignor.

On November 20, 1923, a mortgage was executed by May to secure payment to the mortgagee, plaintiff's assignor, of the loan of fifteen thousand dollars. On December 15, 1923, that mortgage, which was duly recorded, was assigned to the plaintiff and has been kept alive by interest payments and extension agreements. The mortgage provides, after the description of the land mortgaged, as follows with reference to the water rights and after-acquired property:

". . . and together with all waters and water rights of every kind and description and however evidenced

or manifested, which now or hereafter may be appurtenant to said premises or any part thereof, or incident to the ownership thereof or any part thereof, or used in connection therewith."

May testified that a little of the water from the Indian land was used by him upon the mortgaged land, the water being transmitted through the irrigation system of the Pleasant Valley Water Users Association, which was incorporated in 1920.

On August 24, 1929, May assigned the memorandum of sale of the Indian allotment to the Wenatchee Beebe Orchard Company to secure repayment of advances by that assignee to May toward payment of the purchase price of the allotment. On September 24, 1929, an instrument was executed by the Wenatchee Beebe Orchard Company and May under which the former agreed to reassign to the latter the memorandum of sale of the Indian allotment upon repayment of all charges.

Under date of August 20, 1930, the Wenatchee Beebe Orchard Company, assignee of Walter May, who was purchaser of the Indian land, received a patent in fee from the United States government for the lands in question. On November 26, 1930, the Wenatchee Beebe Orchard Company conveyed to Walter May all water rights appurtenant to the Indian lands.

On March 18, 1930, J. S. Mooney, of Wenatchee, to whom plaintiff had forwarded the mortgage and notes executed by May with instructions to have the plaintiff's attorney start foreclosure proceedings because May was delinquent in payment of interest on the mortgage, etc., wrote the following letter to the plaintiff:

"We are writing to advise you that we have the mortgage and note that you hold given by Walter May and wife under the above numbered loan. The papers were sent to us by Mr. Worral Wilson of Seattle with

instructions to start making arrangements with attorney C. B. Hughes of this place to start foreclosure on the May loan, however, about 10 days ago we started a deal between the American Fruit Growers of Wenatchee with Mr. May for a term of five years. By so doing the American Fruit Growers will finance the May ranch by paying up all back interest, taxes, insurance bills and any other bills that may be standing against the property. The last four days of last week the Northwest Fruit Exchange which is the selling Agency for the American Fruit Growers and in fact the Northwest Fruit Exchange and the American Fruit Growers are one and same thing; one of the largest shippers in the Northwest. They have made arrangements with the Wenatchee Beebe Fruit Co. to turn over all of the water that belongs with the Indian allotment land which May owned under a real estate contract. You understand the Wenatchee Beebe people have paid to the U. S. Government the full amount of money due on the Indian allotment land, and are expecting a deed from them in a short time. Now the said Wenatchee Beebe Fruit Co. has given to Walter May and wife a signed contract turned over to May and wife for all of the water right that they are securing from the government to the Indian land.

"Mr. May phoned us over long distance yesterday that the contract had been made and signed in the town of Okanogan, Washington. The American Fruit Co. also the Northwest Fruit Exchange as well as Walter May urged that the foreclosure be not started as they were going to perfect the deal whereby you would soon receive all your back interest, back taxes and other bills down to date except the principal of the mortgage, and by giving the American Fruit Growers a contract to run said place for a term of 5 years there is but very little doubt but what these people will put this place into first class condition by putting the water right that Mr. May gets from the Indian land on to the May land, or at least one-half of it. As we understand it the neighborhood land is agreeing to give $10,000 for one-half of the Indian water right and the other half be reserved for the May orchard.

"The writer phoned Worral Wilson over long distance Sunday the 16th and explained this matter to him and advised him that the American Fruit Co. was not willing to go ahead with the financing of the May tract and take possession of it in the event that foreclosure was going to be started. That is if they pay up all back interest and taxes, insurance money and guarantee the payment of interest and taxes they want an extension of five years on the principal of the mortgage.

"We are very familiar with the operations throughout this district by the American Fruit Company and the Northwest Fruit Exchange, and do not hesitate to say that we feel satisfied that they will make a going proposition of the May tract, and believe it is to your best interest to carry on with them with the principal of this mortgage for the term of 5 years, providing they keep up all taxes, interest and other bills in connection with said ranch.

"You understand the only reason that they are going into this matter with May is for the tonnage that they expect to take off of said ranch. They are holding a number of other places in this same way throughout this district. It is only a matter of about a week until there will be further developments that we will be able to give you along this line. Furthermore if this matter is handled the way it is now outlined the Indian water will be piped to the May land which will cost several thousand dollars. When that is done this May ranch should be a success, and a paying proposition.

"After talking to Mr. Wilson he suggested that we do not start foreclosure so as to embarrass the people that are framing up this lease with Mr. May and also requested us to drop you a line at an early date stating what the prospects are for getting this matter in shape. We feel that this should work out in a short time to the best of all concerned.

"We would be pleased to hear from you making any suggestions that you see fit to make."

On March 25, 1930, plaintiff telegraphed from Los Angeles, California, that it would extend the mortgage to November 20, 1935, on condition that all debts, land

and water taxes, and mortgage interests were paid to date and agreed to wait ten days before starting foreclosure proceedings, within which the Northwestern Fruit Exchange would have time to make legal arrangements "protecting themselves and remitting to us." No further notice was given to the plaintiff, and no further action was requested of it.

On March 27, 1930, Benjamin H. Blackman entered into an agreement for the purchase from May for a consideration of $15,200, of the first twenty miner's inches of the Indian water right of fifty miner's inches and 26/100th interest in the pipe line to be constructed to conduct water to the May and Blackman land. In order to make use of the water on his own land, it became necessary that May secure permission of the state for transfer of the place of use of the water, and that the point of diversion be changed.

It was necessary to construct a pipe line and to secure rights of way and easements therefor in order to carry the water from the Indian water right to the May and Blackman lands. To secure the necessary funds for this purpose, May entered into an agreement with Northwestern Fruit Exchange and with Benjamin H. Blackman, under which that corporation and Blackman were to advance the money to May for the purposes named. Blackman agreed to pay, and did pay, $15,200, for which he was to receive the first twenty inches of the water right and a 26/100th interest in the pipe line and easements. The Northwestern Fruit Exchange financed the remainder of the cost, to secure payment of which a mortgage was given to the Northwestern Fruit Exchange on the water right, pipe line, and easements. The agreement between May and Blackman was executed March 27, 1930. That agreement reads as follows:

"THIS AGREEMENT made and entered into in duplicate this 27th day of March A. D. 1930, by and be-

tween Walter May and Mabelle F. May, his wife, as parties of the first part, and Benjamin H. Blackman and Mathilde Blackman, his wife, as parties of the second part, WITNESSETH:

"Whereas, the parties of the first part herein are the owners of the following described water rights situate in Okanogan county, Washington, to-wit:

". . . that certain water right granted and awarded to the lands hereinafter described by decree of the district court of the United States for the eastern district of Washington, northern division, in cause No. 3322, entitled: United States of America, Plaintiff, vs. Helensdale Investment Company, et al., defendants, the lands described in said decree being as follows:

"Beginning on the northwest side of the Okanogan river at the water's edge, about 4 chains below where Loupe-Loupe creek empties into the Okanogan, and running north (Variation N. 22° E.) at 50 links from waters edge set post on top of river bank, continued line and at 5 chains entered channel of Loupe-Loupe creek and following it for 3 chains crossed to the east side of it, and at 45 chains from beginning set pile of rock for northeast corner of claim; thence due west and 7.75 chains crossed Loupe-Loupe creek, continued line and at 30 chains set post in pile of stones for northwest corner of claim; thence south 55 chains to edge of water in Okanogan river and set post on line at top of river bank 1 chain from water's edge; thence north 72° east with northwest bank of Okanogan river 33.25 chains to the beginning, in sections eight (8), nine (9) and seventeen (17), township thirty-two (32) north, of range twenty-five (25) east of the Willamette Meridian, in the state of Washington, containing one hundred and sixty acres,

"And whereas, first parties have petitioned the proper department of the state of Washington for authority to transfer the point of diversion and to transfer the use of said water right from said allotment to other lands in Okanogan county, Washington, and

"Whereas, the parties of the first part herein contemplate the construction of a pipe line to convey said waters from a point on Loupe-Loupe creek in Oka-

nogan county, Washington, about the center of section 32, township 33, north range 25, E. W. M. to a point in section 26, township 33, north range 25, E. W. M., and all in accordance with plans and specifications hereto attached, and

"Whereas, second parties desire to purchase a portion of said water right and to acquire an interest in said pipe line when constructed,

"Now THEREFORE, in consideration of the mutual covenants and agreements herein contained the parties hereto agree as follows:

"1. The parties of the first part agree to complete their application for change in point of diversion of said waters and for right to permanently transfer the use of said waters from said allotment to other lands designated by the parties of the first part herein in said petition, and to use every reasonable effort to secure an early order granting said application from the proper department of the state of Washington.

"2. The parties of the first part agree to procure all easements of rights of way necessary for the establishment of pipe line hereinafter described.

"3. The parties of the first part agree to construct forthwith a steel pipe line from a point on Loupe-Loupe creek in Okanogan county near the center of section 32, township 33, north range 25, E. W. M., and continuing in an easterly direction for a distance of approximately 19,000 feet to a point in section 26, township 33 north range 25, E. W. M., and all in accordance with plans and specifications hereto attached.

"4. Upon completion of said pipe line free and clear of all encumbrances the parties of the first part herein agree to convey to the parties of the second part herein by a good and valid deed of conveyance the first twenty inches miners measure under a six inch pressure from the above described water right and to convey to the party of the second part by bill of sale and/or deed an undivided 26/100ths interest in and to said pipe line and easements over and along which the same is constructed.

"5. Upon tender of deeds or other valid instruments of conveyance in and to said water rights and in and to said 26/100ths interest in said pipe line and ease-

ments free and clear of encumbrances by the parties of the first part the parties of the second part agree to pay to the parties of the first part herein the sum of $15,200 with interest thereon at the rate of 8% per annum from this date.

"IN WITNESS WHEREOF the said parties have executed this agreement the day and year first above written.

> "(Signed) WALTER MAY
> MABELLE F. MAY
> *Parties of the first part.*
> BENJAMIN H. BLACKMAN
> MATHILDE BLACKMAN
> *Parties of the second part.*"

The mortgage of March 27, 1930, to the Northwestern Fruit Exchange was executed and recorded prior to the patent of the United States to the Wenatchee Beebe Corporation in August 20, 1930, and prior to the deed of the Wenatchee Beebe Corporation to May, November 26, 1930, conveying all water rights appurtenant to the Indian land. When Blackman paid the consideration of $15,200 for the interest in the water right and pipe line, as above recited, the Northwestern Fruit Exchange gave May a partial release of its mortgage which covered that interest, and May conveyed the twenty inches of water and the 26/100ths interest in the pipe line and easements to Blackman August 21, 1930. A good title could not be earlier conveyed, as the patent to Beebe was not issued until August 20, 1930.

On April 10, 1930, Walter May filed a petition, as required by statute, with the state division of hydraulics for change in point of diversion and place of use of the water of Loupe Loupe creek. The pertinent statutory provision reads as follows:

"The right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which

the same is used: Provided, however, That said right may be transferred to another or to others and become appurtenant to any other land or place of use without loss of priority of right theretofore established if such change can be made without detriment or injury to existing rights. The point of diversion of water for beneficial use or the purpose of use may be changed, if such change can be made without detriment or injury to existing rights. Before any transfer of such right to use water or change of the point of diversion of water or change of purpose of use can be made, any person having an interest in the transfer or change, shall file a written application therefor with the state supervisor of hydraulics, and said application shall not be granted until notice of said application shall be published as provided in section 7381 of this act. If it shall appear that such transfer or such change may be made without injury or detriment to existing rights, the state supervisor of hydraulics shall issue to the applicant a certificate in duplicate granting the right for such transfer or for such change of point of diversion or of use. The certificate so issued shall be filed and be made a record in the office of the state supervisor of hydraulics and the duplicate certificate issued to the applicant may be filed with the county auditor in like manner and with the same effect as provided in the original certificate or permit to divert water." Rem. Rev. Stat., § 7391 [P. C. § 7241].

On June 5, 1930, the petition was granted.

On February 27, 1936, the plaintiff's mortgage being in default, this action for foreclosure of same was instituted by the plaintiff, which named as additional defendants the Northwestern Fruit Exchange and Benjamin H. Blackman and wife.

Plaintiff claimed a first lien on the orchard lands described in the mortgage and on all water rights belonging thereto, including the fifty miner's inches of Indian water rights and the rights of way for and the pipe line used in conducting water from Loupe Loupe creek at the point of the intake designated in the cer-

tificate of the state hydraulic engineer to and upon the May land. The Blackmans claimed that they had the first right to use twenty inches of water from Loupe Loupe creek and were the owners, clear of all encumbrances, of 26/100ths interest in the pipe line and easements used in conveying water from Loupe Loupe creek to the Blackman land. The Northwestern Fruit Exchange claimed that its mortgage was a first and prior lien on the Indian water rights and on the pipe line and rights of way therefor, less only the Blackman rights.

The trial court adjudged plaintiff was the holder of a first lien mortgage on the Walter May orchard and on thirty miner's inches of the Indian water right, with equal priority in the use thereof with defendants Blackman; and that plaintiff's mortgage is a second lien on the pipe line and rights of way therefor as appurtenant to and as an easement connected with and belonging to the May lands, subject to a first lien on same in favor of the defendant Northwestern Fruit Exchange. The court further adjudged that the mortgage of the Northwestern Fruit Exchange is a first lien mortgage on 74/100ths interest in and to the pipe line and rights of way therefor, and a second lien on thirty miner's inches of the Indian water right, but inferior in priority and subject to the twenty inches of water claimed by defendants Blackman out of the total of fifty inches of the Indian water rights. The defendants Blackman were adjudged to be entitled to twenty inches out of the total fifty miner's inches of Indian water rights without priority in use over the remaining thirty inches; and the Blackmans were also adjudged to be the owners of 26/100ths undivided interest in and to the pipe line and rights of way therefor.

A decree of foreclosure was entered in conformity to the foregoing. The plaintiff appealed, and defend-

ants Northwestern Fruit Exchange and Blackman *et ux.* cross-appealed, from that decree.

It is the position of appellant insurance company that, under the above-quoted provision of its mortgage with reference to water rights and after-acquired property, that mortgage is a lien on the Indian water right equal in priority to the share of the Blackmans in that water; and that the insurance company's mortgage is prior to the mortgage lien of the Northwestern Fruit Exchange on the water rights and the pipe line carrying the water.

We are in accord with the position of the Blackmans that the decree should be modified so as to quiet their title to the first twenty inches of the Indian water right and to 26/100ths interest in the pipe line and easements, free and clear of any claim or lien of the insurance company under its mortgage. The Northwestern Fruit Exchange correctly contends that it is entitled, under its mortgage, to a first lien on the Indian water right and on the pipe line and rights of way, less only the rights of the Blackmans.

The Indian water right was originally appurtenant to the Indian allotment, to which it continued to be appurtenant until legally severed therefrom. While there was an executory contract made some years prior thereto, title did not pass from the government until issuance of a patent August 20, 1930, which vested the legal title in the Wenatchee Beebe Fruit Company. The executory contract gave no right to May to sever the water from the land until he had paid the full purchase price therefor. May did not acquire the full legal title until November 26, 1930, when same was conveyed to him by deed from Beebe. Eight months prior to that date, May agreed to sell the first twenty inches of water and a 26/100ths interest in the pipe line to Blackman for $15,200. As soon as the government was

paid and patent was issued, May conveyed those rights to Blackman. Therefore, they immediately became appurtenant to the Blackman land and were never appurtenant to the May land. Blackman was the first to actually use any of this water which came through the pipe line; and he has, since the acquisition of his title thereto, continuously used the first twenty inches of water delivered through the pipe line on his land.

As stated above, there was no severance of the water right of fifty inches from the Indian allotment until the purchase price had been fully paid. May agreed in his contract with Blackman to secure a transfer of this Indian water right in the manner provided by the statute (Rem. Rev. Stat., § 7391). His petition for a change of the point of diversion and for a change in the place of use from the Loupe Loupe Charley allotment to lands in certain described sections discloses no intention to transfer that water to May's land alone; if so, the petition and certificate would have so stated. The intention, manifestly, was to place the water on other land as well as the land of the Blackmans.

If the insurance company's mortgage became a lien on any subsequently acquired water rights, the mortgage could not affect anything more than the equity or rights of May. Logically, it would follow, the mortgage lien of the insurance company, if it attached at all, attached to the rights of May subject to all outstanding rights and equities. When Wenatchee Beebe Orchard Company, Northwestern Fruit Exchange, and the Blackmans succeeded to the Indian water right and to the pipe line and rights of way by contracts, mortgages, and conveyances, May's rights were limited by the rights acquired by those three parties.

The Indian water right, which was acquired by mortgagor May subsequent to the mortgage of his land to the insurance company, was subject to liens as de-

scribed above when it came into the mortgagor's hands. Hence, the mortgagee insurance company takes no greater interest in this after-acquired interest than the mortgagor acquired. *Fosdick v. Schall,* 99 U. S. 235, 25 L. Ed. 339.

"A mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands. If that property is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior to it in point of time. It only attaches to such interest as the mortgagor acquires; . . ." *United States v. New Orleans Railroad,* 79 U. S. 362, 20 L. Ed. 434.

If one gives a mortgage on property which he does not then own but which he subsequently acquires, the mortgage covers only the interest which the mortgagor takes when he later acquires title. A mortgage intended to cover after-acquired property attaches to such property only in the condition in which it comes into the mortgagor's hands. See 19 R. C. L. 409, § 188; 1 Jones on Mortgages (8th ed.), 254, § 214.

It is unnecessary to discuss other suggested questions. Under the facts recited above, we are clear that the cross-appellants are entitled to the relief they seek.

The judgment is affirmed on appeal of the plaintiff and reversed on the cross-appeal of defendants Northwestern Fruit Exchange and Benjamin H. Blackman *et ux.,* and the cause remanded with direction to the trial court to grant to the cross-appellants the relief for which they pray.

STEINERT, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.