### HARDESTY *v.* PYLE.

*(Circuit Court, W. D. Pennsylvania.   March 21, 1883.)*

**1. RAILROAD MORTGAGE—ROLLING STOCK.**

Rolling stock does not necessarily become affixed to the railroad upon which it is placed. Therefore, a mortgage, although in terms covering future-to-be-acquired rolling stock, does not attach to the rolling stock of a third person subsequently placed on the road under a contract with a company then operating it.

**2. EXECUTION—LEVY UNDER WRIT.**

A sheriff's return to a writ of *fi. fa.*—"And I have, therefore, by virtue of the same written writ, levied upon all the right, title, interest, and claim of the S. & M. Railroad Company, of, in, and to the S. & M. Railroad, in Somerset county, and state of Pennsylvania, and upon all the property, real, personal, and mixed, including locomotive, cars, * * * now in the regular use of the said S. & M. Railroad Company, in the conducting of its business as a carrier"—imports a seizure of the locomotive and cars, and in an action of trespass against the sheriff, is conclusive evidence against him of such seizure.

**3. SAME—AGREEMENT AS TO ROLLING STOCK SEIZED.**

The attorneys at law of the plaintiff, (the owner of the rolling stock,) in that capacity merely, and without special authority so to do, signed an agreement as the basis of a consentable decree in an equity suit, to which the plaintiff was a stranger, and in which he had no interest, which provided, *inter alia*, for the withdrawal of exceptions to the sheriff's sale, filed by the railroad company, (the defendant in the execution,) and the confirmation of the sale, and the return of the locomotive to the railroad, and its delivery to the sheriff's vendee; the preamble of the agreement reciting, "Whereas, it is desirable that the relative rights of all parties interested or concerned should be determined at law;" and the sixth clause of the paper declaring, "The rights of R. S. Hardesty [the plaintiff] to any title or claim to the rolling stock, if he has any legal right, shall be determined according to law. This agreement is not to prejudice any right he may, and which can be, legally established to the rolling stock." The sheriff was not a party to the equity suit or the agreement. *Held,* that the

agreement must be construed as reserving to the plaintiff all his legal remedies, and did not operate as an estoppel to bar his action of trespass against the sheriff.

*Sur* motion on the part of the defendant for a new trial.

*Wm. M. Hall* and *Geo. W. Guthrie*, for motion.

*H. W. Wier*, for plaintiff.

Before McKENNAN and ACHESON, JJ.

ACHESON, J. 1. We cannot give our assent to the proposition that the rolling stock in question was bound by the first mortgage of the first corporation. That company never owned any rolling stock, and none passed to the purchaser of the railroad at the sale under the company's second mortgage. The locomotive and cars were acquired after that sale, and after the incorporation of the second company. Moreover, the jury have found that they were not the property of the second company, but were purchased and owned by Coffroth, Uhl & Sanner, and that their title became vested in the plaintiff before the trespass complained of. It is true the first mortgage in terms covered the "future-to-be-acquired" rolling stock of the company, and, doubtless, it would have attached to engines and cars subsequently acquired by the mortgagor and placed upon the road. But none of the cases relied on by the learned counsel gives countenance to the notion that such mortgage grasps the rolling stock of third persons, temporarily used upon the railroad, under a contract between them and a company subsequently operating the road. Such rolling stock does not become affixed to and a part of the railroad. *U. S.* v. *New Orleans R. R.* 12 Wall. 362. It remains "loose property, and susceptible of separate ownership." Id. 365. Speaking of the rights of railroad mortgagees in after-acquired cars, Chief Justice WAITE, in *Fosdick* v. *Schall*, 99 U. S. 251, said: "The mortgagees take just such an interest in the property as the mortgagor acquired; no more, no less." Here the mortgagor never had any interest in the locomotive and cars, and the verdict establishes that at the time of the sheriff's levy they were the individual personal property of the plaintiff.

2. But the defendant insists that it was error to hold that the sheriff's return to the writ of *fi. fa.* imported a seizure of the locomotive and cars. The return, after reciting demand and non-payment, proceeds in the words following:

"And I have, therefore, by virtue of the same written writ, levied upon all the right, title, interest, and claim of the Somerset & Mineral Point Railroad Company of, in, and to the Somerset & Mineral Point Railroad, in Somerset

county, and state of Pensylvania, and upon all the property, real, personal, and mixed, including locomotive, cars, hand-cars, tools, engine-houses, depot, water-station, siding, and switches now in the regular use of the said Somerset & Mineral Point Railroad Company in the conducting of its business as a carirer, and the rights, franchises, privileges, and rights of way of said company incident, appurtenant, or in any wise appertaining or connected therewith. Taken in execution as the property of the Somerset & Mineral Point Railroad Company at the suit of John Roth," etc.

This return is drawn with much precision, and, we think, admits of but one interpretation. While the seizure was of the right, title, and interest of the defendant in the execution in and to the described railroad, as respects the "locomotive, cars," etc., "in the regular use" of the defendant "in the conducting of its business as a carrier," the levy, by very exact language, was upon the things themselves, and not merely upon the defendant's interest therein. If, as is now claimed, the intention was simply to levy upon the right, title, and interest of the defendant company in the railroad and its appurtenances, together with the corporate franchises, as an entirety, different phraseology would have been employed. We do not see how, under the terms of the levy, the plaintiff could have removed the locomotive and cars without defying the authority of the sheriff and becoming a trespasser against him. *Welsh* v. *Bell*, 32 Pa. St. 12 Our construction of the return is consistent with, and is fully justified by, the conduct of the sheriff. By the uncontradicted evidence it was shown that after the levy and before his sale he locked the wheels of the cars. It is idle to say that this was but to prevent the cars being run off in violation of an injunction in another proceeding. The sheriff had no process in his hands, other than the writ of *fi. fa.*, which gave him any color of authority to touch the cars.

If the construction given to the levy was correct the charge to the jury as to its effect was undoubtedly accurate. A levy by the sheriff upon the goods of a stranger to the execution is the exercise of dominion over them sufficient to constitute a trespass, though there be no actual taking or touching of the goods. *Welsh* v. *Bell, supra; Wintringham* v. *Lafoy*, 7 Cow. 736; *Miller* v. *Baker*, 1 Metc. 27. And the sheriff's return that he levied is conclusive evidence against him that he seized and took the goods into his possession. *Welsh* v. *Bell, supra.* So, also, in *Paxton* v. *Steckel*, 2 Pa. St. 93, it was held that the sheriff's return "attached 24 pieces of iron, etc., in the possession of J. Stettler," subjected the sheriff to an action of trespass, and was conclusive evidence against him.

It is, however, urged that constructive seizure is predicable only of a lawful execution, and that there can be no such thing where the writ or levy is void. But if this be conceded we do not see how it helps the defendant. There is absolutely no foundation for the insinuation that the execution here was unlawful. It was the ordinary writ of *fieri facias* against a corporation. The counsel assume that under the Pennsylvania statutes a levy upon the railroad and franchises of a corporation cannot be made under such a writ, but only upon an *alias* or *pluries* writ after a return of *nulla bona*. We do not know that this has been authoritatively decided, and do not feel called on to express any opinion as to what is the correct practice. We incline to think that such levy made on the first *fi. fa.* would, at the most, be but an irregularity, and by no means a nullity. But however this may be, the writ here unquestionably authorized the sheriff to levy on personal property, which he proceeded to do, as his return clearly shows; and the plaintiff's grievance is that the levy embraced his goods and chattels. Surely it is a poor answer for the sheriff to make that his levy, as a whole, was broader than his writ warranted.

3. The defendant contends that the court erred in refusing to charge that the agreement of January 8, 1879, estopped the plaintiff from suing the sheriff in trespass. But if the construction which the defendant claims for that instrument be the true one, it might well be doubted whether Messrs. Rupple and Hay, in their mere capacity of attorneys, could bind the plaintiff by their signature. *Holker* v. *Parker*, 7 Cranch, 436; *Gable* v. *Hain*, 1 Pen. & W. 264; *Willis* v. *Willis*, 12 Pa. St. 159; *Stokely* v. *Robinson*, 34 Pa. St. 315. The agreement did not in any wise benefit the plaintiff, and was made in an equity suit (as the basis of a decree therein) to which he was an entire stranger, and in which he had no interest. Nor had he any concern with the rule for an attachment for contempt, the pendency of which was the occasion of the agreement. Moreover the defendant (the sheriff) was no party to that suit or to the agreement. It is then very questionable under the decisions whether Messrs. Rupple and Hay, without special authority so to do, could thus release or destroy the plaintiff's right of action against the defendant.

But the paper does not profess to do so, and we think it is not fairly open to a construction which would produce that result. The parties to the agreement were not dealing with any question between the plaintiff and the defendant. The main purpose in view was to purge a contempt of court and secure a return of the locomotive which

had been run off by Newmeyer and McCaleb under a claim of right, but in violation of an injunction. The sixth clause of the agreement declares: "The rights of R. S. Hardesty to any title or claim to the rolling stock, if he has any legal right, shall be determined according to law. This agreement is not to prejudice any right he may have and which can be legally established to the rolling stock." The whole paper is to be read in the light of the concluding paragraph of the preamble, viz.: "And, whereas, it is desirable that the relative rights of all parties interested or concerned *should be determined at law.*" This furnishes the key to the true intention of the parties. A consentable decree was to be entered in the equity suit and all parties left to their legal remedies. In our opinion it would be a perversion of the agreement to hold that it bars the plaintiff's action against the sheriff for his trespass.

4. Since the hearing of this motion I have carefully read the testimony bearing on the question of damages to see whether there is good reason for the allegation that the verdict is excessive under the evidence. Upon this branch of the case the plaintiff examined six witnesses and the defendant two. The two witnesses on the part of the plaintiff, who testified concerning the locomotive, not only had personal knowledge of its condition, but were machinists who for many years had been employed in the building of locomotives. They were quite as competent to testify as to value as were the defendant's witnesses, so far as appeared. Deducting from the verdict the interest included therein, would give $11,000 as the value the jury placed on the rolling stock. As it consisted of a locomotive, one passenger car, a baggage car, and two gondola cars, the valuation is not apparently extravagant, and we have been furnished with no new evidence to show it to be excessive. It is a mistake to say that in respect to the damages the jury blindly followed the plaintiff's witnesses. The verdict would have been larger by $2,000 or $3,000 if the jury had adopted the *minimum* figures of those witnesses. In point of intelligence the jury was rather above the average, and we are not convinced that the verdict did the defendant injustice.

What has been said covers the grounds for a new trial which counsel most discussed. We do not think the other reasons assigned call for special remark. After a careful consideration of the whole case, we are of opinion that the motion for a new trial should be overruled, and judgment entered on the verdict. And it is so ordered.