THE CAMBRIA IRON COMPANY ET AL. *v.* THE UNION TRUST COMPANY OF ST. LOUIS ET AL.

[No. 17,848.   Filed Dec. 12, 1899.   Rehearing denied March 7, 1900.]

PARTIES.—*Interpleader.—Practice.—Petition.—Sufficiency.*—One not a party, having an interest in the subject-matter of a pending action that may be adversely affected by the suit, will be permitted, upon a proper showing, under §273 Burns 1894, to come into the case for the protection of his interests, and such petition of intervention need not be as formal as a complaint, and is sufficient if it contains a succinct statement of the facts upon which the equities claimed are predicated.   *p. 296.*

STREET RAILROADS.— *Franchises.— Street Improvements.— Paving Between Tracks.*—A franchise granting a street railway company the right to occupy the streets of a city conditioned that the street between the tracks shall be paved " when and as the street may be paved," requires the railway company to pave the space between its tracks when the street is paved.   *pp. 297-301.*

MORTGAGES.—*Street Railroads.—Liens for Improvements.—Priority.* —A petition by an intervener, in an action to foreclose a mortgage against a street railway company, seeking to enforce a claim for material furnished for paving between the company's tracks as preferential to the mortgage, on the theory that the company materially increased the value of its property after the execution of the mortgage, is insufficient, where it is not alleged that the increase in value was made from the current earnings of the company.   *pp. 297-303.*

SAME.— *Street Railroads.— Liens for Improvement.— Priority.*— Where, by its charter, a street railroad company was required to pave between its tracks when and as the streets occupied by it were improved, as a condition to the enjoyment of the franchise, such condition was carried into a mortgage executed by the company upon its property, and the lien of a material man for material furnished for paving between the tracks of the company is paramount to the lien of the mortgage.   *pp. 303-307.*

APPEAL AND ERROR.—*Notice.—Appearance.*—In the absence of an appearance and declination, a co-appellant will be regarded as having joined in an appeal, where the record shows that notice of the appeal was given.   *p. 308.*

SAME.—*Notice.—Appearance.*—Where a co-party appeared, assigned errors, and filed a brief in support thereof, such appearance cured any defects in the notice given by appellant.   *p. 308.*

From the Wayne Circuit Court. *Reversed.*

*H. C. Fox, W. L. Taylor* and *A. C. Lindemuth*, for appellants.

*Seddon & Blair* and *John L. Rupe*, for appellees.

HADLEY, C. J.—The Richmond City Railway Company had operated a railroad over the streets of the city of Richmond for many years with animal power, and in March, 1889, the city council passed an ordinance granting the company a new franchise for the period of fifty years, and authorizing the company to operate its street railroads by means of cable, electric, or animal power "or either or any of them" upon the conditions recited in the ordinance. The company accepted said ordinance, as amended, April 22, 1889, reorganized thereunder, and in January, 1890, to secure its 200 $1,000 bonds executed to the now appellees its mortgage on all its property and "all rents, profits, tolls, issues, and income derived or arising therefrom".

In 1892, it was deemed necessary and expedient by the common council of the city to pave with vitrified brick three squares of Main street, and, having adopted a declaratory resolution and ordinance therefor, gave notice to the Richmond City Railway Company to pave between its tracks on said squares "when and as the street was improved". The company failing to comply with the notice, the city paved between the tracks when and as the street was paved, and, upon completion of the work, charged against the company the actual cost thereof, namely $3,011.30, and demanded payment. The company failed and refused to pay the demand.

Thereafter, in April, 1893, the city, desiring to pave with brick twelve additional squares of Main street, entered into what is termed a compromise settlement with the street-car company of all disputes and liabilities of the company to pave between its tracks, and in the settlement agreement it was specifically stipulated, as declared by ordinance and

acceptance thereof in writing, that the city should remit its claim of $3,011.30 for the pavement already constructed, and that the company should thereafter pay for all such improvements between its tracks, if the cost thereof should be assessed against its property, under the provisions of the Barrett law; the same to become a lien and be enforced in the same manner as such assessments are enforced against abutting property owners.

After the agreement, in the summer of the same year, twelve squares of Main street were, by process of law, paved with brick. The work was performed and materials furnished by the Standard Paving Company under a contract it had with the city for that purpose. The actual and reasonable cost of paving between the company's tracks, for the twelve additional squares, was $13,177.90, which was assessed against its right of way and property for payment in twenty successive semi-annual payments, in pursuance of the compromise agreement. It was stipulated in the contract between the city and the Standard Paving Company that the city should be liable, on account of said improvement, only for the cost of so much of the same as bordered on public grounds and for the crossings of streets and alleys, as provided by the ordinance and laws of this State. The railway company refused to pay any part of the sum so assessed against it for pavement between its tracks. The Standard Paving Company purchased the brick used in the improvement of said twelve additional squares from the Royal Brick Company and the Canton Brick Company, appellants herein, and, as part payment therefor, the Standard Company duly assigned in writing to said appellants all its interest in the claim against the street railroad company for paving between its tracks for the said twelve squares. Whatever rights and equities the Standard Paving Company acquired against the railroad company or its property, by reason of said improvements, were held by the Royal and Canton brick companies at the time of filing their petition of intervention. The com-

pany, having made default in the payment of its obligations, secured by its said mortgage, the mortgagees, being the appellees in this case, brought their action in the Wayne Circuit Court for the foreclosure of their mortgage, and the appointment of a receiver; to which action the Richmond City Railway Company, the city of Richmond, and the Standard Paving Company, among many others, were made parties defendant.

It was alleged in the complaint that the Standard Paving Company was claiming to hold a lien against the mortgaged property paramount to the mortgage lien of the plaintiffs, which was unfounded; and the Paving Company was made defendant, and required to assert its lien, if it had any. The default in payment of the street-car company was alleged, the company voluntarily appeared and filed answer, and a reciever was appointed, qualified, and took full possession of the mortgaged property upon the same day the complaint was filed. Pending the formation of issues between the various parties, the appellants, Royal and Canton brick companies, without objection from appellees, obtained leave of court to file their intervening petition, and become parties to the action of foreclosure. The petition set forth with much detail the facts stated above, and particularly the franchise ordinance, the acceptance and reorganization thereunder, the adoption of electricity as a motive power, the paving of Main street with brick, notice to the railway company to pave between its tracks when and as the street was improved, its failure and refusal to do so, the doing of the work by the city, the assessment of the actual and reasonable cost thereof to the railway company, its refusal and failure to pay the same, the compromise agreement between the city and company, the performance of the conditions by the city and the non-performance by the company; that the Standard Paving Company as contractor with the city did the work and furnished the materials in the paving of the twelve squares of Main street; that the Standard

Company purchased of these interveners all the brick used in paving said twelve squares, and in part payment therefor duly assigned to them in writing, which assignment is filed therewith, all rights and equities held by it against the street-car company; that the actual and reasonable cost of paving between the tracks of the railway for the distance of the twelve squares was $13,177.90, which is due and unpaid; that, under its contract with the Standard Paving Company, the city is not liable for any part of said sum of $13,177.90; that, after the execution of the plaintiff's mortgage, the railway company purchased and added to the mortgaged property, in machinery, equipments, and track extensions, property and improvements of the value of $65,000. Prayer: That, in any judgment or decree that may be entered herein, the claim of these petitioners may be held a just lien upon the mortgaged property of the Richmond City Railway Company, and that, upon sale thereof upon decree of this court, the claim of these petitioners be ordered first paid, after payment of costs, out of the proceeds of such sale, and for all further proper relief.

The city of Richmond, appellant, also filed an intervening petition for the use of the Royal Brick Company et al. The plaintiffs filed a demurrer to the petition of the Royal Brick Company et al., (1) for insufficiency of facts; and (2) for defect of parties in this, that the Standard Paving Company was not made a party defendant. The plaintiff's demurrer was sustained, and the interveners refusing to plead further, and electing to stand by their petition, the court rendered judgment upon the demurrer against them, from which they appeal.

As shown by the briefs, the intervening petitions of all the other appellants have been fully settled out of court, and "the intervening petitions of the Royal Brick Company et al., and of the city of Richmond are based upon the same right, seek to enforce the same claim, and are substantially set forth in the same words." We will therefore consider

only the questions arising upon the Brick Companies' petition. It is first claimed that the appellants have no standing in court, that they came in neither by complaint, cross-complaint nor answer, and that there is no such pleading known to our code as an intervening petition. While the code does not in terms recognize an intervener as a party litigant, yet this court has many times recognized in a party the attributes of an intervener in equity. *Barner* v. *Bayless*, 134 Ind. 600, 603, and cases cited; *State* v. *Bank*, 145 Ind. 537, 544.

It is the spirit of our code to settle in a single action the rights and equities of all persons interested in the subject-matter, and to simplify the rules of practice and pleading, as far as the same may be done, with due regard to the just determination of the controversy. To accomplish this end, therefore, one not a party, and having an interest in the subject-matter of a pending action that may be adversely affected by the suit, will be permitted by the court, upon a proper showing, under §273 Burns 1894, to come into the case for the protection of whatever right or interest he may have in the subject-matter. *Voorhees* v. *Indianapolis, etc., Co.*, 140 Ind. 220; *Zumbro* v. *Parnin*, 141 Ind. 430. And his pleading, as in this case, is neither a cross-complaint nor an answer, and hence not subject to the objections urged. It seeks neither to set up a cross action against the plaintiffs, nor to bar their right of recovery. The petitioners are interested in the subject-matter of the suit. Without intervention, the property may be sold, and pass forever beyond their reach. It is now in the custody of the law. The plaintiffs seek its sale and application to the payment of their debt. The common debtor and subject-matter are before the court, and the only relief sought is that, if the sale of the property is ordered, the equities of the interveners in the funds arising therefrom may be enforced against the plaintiffs. There can be no doubt of the remedy thus afforded a stranger to the suit to enter, by leave of court, for the.

timely protection of his interests; and a petition of intervention need not be as formal as a complaint, and is sufficient in form if it contains a succinct and definite statement or recital of the facts upon which the equities claimed are predicated. *Empire Distilling Co. v. McNulta*, 77 Fed. 700.

Appellees have suggested no specific infirmity in the facts alleged, and we are unable to discover any. The objection that the city of Richmond was not a party to the petition is unavailing under the demurrer as presented, and it is not urged that the Standard Paving Company, the petitioners' assignor, was a necessary party.

But it is earnestly urged that the ordinance conferring upon the Richmond City Railway Company the right to occupy the streets of the city of Richmond, exhibited with the petition, imposed no duty upon the railway company to pave between its tracks, and hence no lien, either preferential or specific, was created in the interveners' assignor for the construction of such pavement. With this contention we are unable to agree. In considering the question, it must be borne in mind that the following propositions of law have been by this court declared settled in this jurisdiction, viz.: (a) That a charter granted by a city, and accepted by a railway company, constitutes a contract between the city and company; (b) that such a charter must be strictly construed against the company; (c) that such company has no doubtful rights under such charter; (d) that where there are doubts they must be construed against the grantee, and in favor of the city. *Western Paving, etc., Co. v. Citizens St. R. Co.*, 128 Ind. 525, 530, 10 L. R. A. 770; *State v. Common Council*, 138 Ind. 455, 468; *City of Indianapolis v. Consumers, etc., Co.*, 140 Ind. 107, 116, 27 L. R. A. 514.

The first section of the franchise ordinance provides that permission and authority are hereby granted and fully vested in the Richmond City Railway Company, its successors and assigns, to lay, construct, operate, and maintain a single or

double track street railroad, with all the necessary and con-
venient tracks etc., in and upon all the streets and alleys of
said city, *subject to .the conditions hereinafter mentioned,*
to wit: "Sec. 2. The motive power of said street railway
shall be cable, electric, or animal. Sec. 3. The tracks of
said railroad shall be so laid as to conform to the established
grade of the streets, and in such manner as to be no unnec-
essary impediment to the ordinary use of the streets and
the passage of wagons or other vehicles along and across the
tracks. Sec. 5. If the railroad is operated by electricity,
the *streets,* wherever disturbed, obstructed, or damaged by
reason of the construction, repair, or existence of said rail-
road, shall be by said company promptly restored to the
same condition as they were prior to such disturbance and
so maintained for one year thereafter. Sec. 6. The *side-
walks, curbs,* or *gutters,* disturbed or injured in the erection
of poles or wires, shall be by said company promptly restored
and maintained for one year. Sec. 7. All tracks shall be
laid in the middle of the street. Sec. 8. The center and
cross wires shall· at no point be at less elevation than eighteen
feet above the rails. Sec. 9. The curb poles shall not
exceed twenty-two feet in height. Sec. 10. The poles shall
not be nearer together than 125 feet, with possible varia-
tions to avoid interference with shade trees and ingress and
egress of property owners. Sec. 11. The poles shall be
straight, smooth, and painted. Sec. 12. [As amended
April 22, 1889.] In case electric power is used,
the rail may be 'T' rail, and the street shall be graveled,
paved, or macadamized up flush with top of rail upon the
outside thereof, *when and as the street may* be graveled,
paved or macadamized, upon which the same are laid, and
the street between the rails shall be graveled, paved, or
macadamized, *when and as the street may* be graveled,
paved, or macadamized, upon which the same is laid, upon
a level with the top of the rail, and as near to the rail as the
same can be done, leaving sufficient space only for the flange

of the wheel, and so maintained; and, in case animal power is adopted as the motive power, a flat rail shall be substituted on or before September 1, 1889, on Main street from Fourth street to Twenty-first street, and on North Eighth street from Main to North E street, and as far east on North E street as Tenth street. Said street railway shall have the right to extend its tracks in Glen Miller Park as now laid, as the said street railway and the committee on parks of said city may hereafter agree, subject to the approval of council. Sec. 17. · Said Richmond City Railway Company hereby agrees to save said city harmless from any damage, loss, or liability occasioned by the construction, maintenance, or operation of said electric or other street railroad."

It is manifest from the foregoing conditions that it was the intention of the city, in granting authority to occupy its streets for private gain, to relieve the public so far as possible from inconvenience in the use of the streets, and from increased burden in their repair and maintenance. This is made clear by section three, which prescribes how the tracks shall be laid, and by sections five and six, which provide that wherever the streets, sidewalks, curbs, or gutters may be disturbed or damaged by the construction of the railroad, the company shall promptly restore the same to as good a condition as before the disturbance.

And what warrant have we for saying that things affixed to a grant, as conditions to its enjoyment, are not conditions at all, but covenants of the grantor? Furthermore, how may we single out from a class of statements, phrased in the same tense, and alike impersonal as to the party of performance, and say some are covenants of the grantor, and some conditions imposed upon the grantee? Yet this is what we are urged by the appellees to do. It is not claimed by appellees that the franchise ordinance imposed upon the city the duty of electing the kind of motive power to be used, as stated by section two, nor of laying the company's track to

conform to the established grade of the streets, as described in section three, nor of erecting and painting its poles, as directed by sections ten and eleven, nor of stretching its wires not less than eighteen feet above the track, as required by section eight; but they do insist that it imposed upon the city the duty of paving between the company's tracks, when and as the street is improved, as required by section twelve; the insistence of appellees being that section twelve should be construed as merely declaratory of the mode of construction between the tracks that the city should thereafter observe when and as the street was improved upon which the track was laid. If it was the intention that the city should pave between the tracks, what reason was there for a specific covenant to do the work when and as the street was improved? Was it at all likely that the city would choose to do it at any other time? And, in the use of electricity, what concern should the railway company feel about the pavement between its tracks, whether graveled, macadamized, or bricked, or whether it was paved at all? And no reason is apparent, and none is suggested, why the city would voluntarily assume an obligation to pave in a particular manner, and at a particular time, in a contract that would conclude it for fifty years. Besides, the reading of the charter ordinance as a whole, and a consideration of the granting section, with the peculiar and uniform "shall be" in the enumerated conditions, upon which the grant is stated to depend, in the light of the rules of construction above announced, leads to the firm conviction that the adoption of the construction invited by appellees would be to subject ourselves to the irresistible construction that all the things enumerated as conditions of the grant are really covenants of the grantor. And this is not to be thought of. It must be said that they are all one or the other, and to doubt is to construe them against the company.

It is also a familiar principle that, when the terms of a written contract are uncertain, the courts will adopt that

construction which the parties themselves place upon it. *Vinton* v. *Baldwin*, 95 Ind. 433; *Louisville, etc., R. Co.* v. *Reynolds*, 118 Ind. 170; *Pate* v. *French*, 122 Ind. 10; *Ingle* v. *Norrington*, 126 Ind. 174; *City of Vincennes* v. *Citizens Gas Co.*, 132 Ind. 114, 16 L. R. A. 485.

Much space is given to the discussion of the effect of the compromise ordinance of 1893, described in the early part of this opinion, upon the charter ordinance of 1889; but we fail to perceive its importance to the questions involved in this appeal. It does not repeal the charter ordinance of 1889, which supports and limits appellee's mortgage, either in terms or by implication. In fact, it is in aid of the charter by expressly declaring in its prefatory clause that it is "by way of a full settlement and compromise of said dispute"; that is, a full and final settlement and understanding of the extent of the company's liability under its charter of 1889. It was a definition of the franchise ordinance, not a repeal. It was nothing more nor less than an agreed construction of a disputed provision, and one which the court would be bound to adopt as between the parties. But, being subsequent to the execution of the mortgage to appellees, and without their approval, it was as to them nugatory. The mortgagees continue to hold the property as they received it from the mortgagor; and they received it in all respects as it was held by the mortgagor at the time the mortgage was delivered. The mortgagor had, therefore, no power to charge the mortgaged property by an unwarranted construction of its charter, nor impose any burden upon the security that did not exist at the time of the mortgage. Hence, appellants must find support for their claim under the charter ordinance of 1889, or they have nothing to rest it upon. On the other hand, the compromise ordinance of 1893, being a contract between the city and the mortgagor with respect to the latter's rights and liabilities under its charter, the appellees, as mortgagees, must accept their mortgagor's contract as a whole, or reject it altogether. They can not have the

benefits without the burdens; that is to say, they can not accept their mortgagor's unauthorized contract to relieve themselves from appellants' preferential claim under the charter ordinance of 1889, and repudiate it to avoid the specific lien fixed upon the mortgaged property by the same instrument.

The new contract provides: "Said Richmond City Railway Company hereby agrees to pay all the cost of paving between the rails of its tracks on the residue of said Main street from the west line of Fourth street to the west line of Sixth street and from the east line of Ninth street to the east line of Twenty-third street, provided said improvement is made under the provisions of the Barrett law"; and the estimated cost shall be assessed against the property of said company, "and when adopted by the common council of said city shall be and constitute a valid lien upon all the real estate, right of way, tracks, rolling stock, and machinery of said company". It is specifically alleged in the intervening petition, and admitted by appellees' demurrer to be true, that the city performed all the conditions of said contract on its part, improved twelve of the squares of Main street, as provided for in the contract, and also paved between the company's tracks, pursuant to said agreement, at the actual and reasonable cost of $13,177.90, which amount was assessed against the company's property, payable in twenty semi-annual payments, etc., in conformity to the provisions of the Barrett law, and that the company wholly failed and refused to pay the same.

Accepting the new contract as a whole, the paramount lien and debt of $13,177.90 is admitted by appellees. Rejecting it as a whole, we must return to the ordinance of 1889, and dispose of this case as if the act of 1893 had not been passed.

The point made by appellees, that the theory of appellants' petition is that their lien is specific under the ordinance of 1893, and not preferential under the charter act of 1889,

and that they must be confined to their theory, can not be accepted. If it is proper in any case—which we greatly doubt—for a court arbitrarily to declare a party's theory from his initial pleading, where the facts pleaded supply more than one, we are relieved of the task in this instance by the course of appellants' argument. Both ordinances are set forth in the petition at length; but the argument in this court, and which is entirely consistent with the pleading, goes to the effect and theory that the ordinance of 1893, designated by appellants as "supplemental" to the ordinance of 1889, should be accepted (1) as establishing a doubt in the charter as to the company's liability to pave between its tracks, and (2) as settling the doubt against the company by convention of the parties.

The most important question remains, namely: Does the petition exhibit such a claim as a court of equity will decree preferential payment from the proceeds of the sale of the mortgaged property? It is said in *Fosdick* v. *Schall*, 99 U. S. 235, 25 L. ed. 339, by Waite, C. J., that "Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income." "The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. * * * While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way."

It is alleged in the petition that after the execution of the mortgage, and after the commencement of the improvement of Main street, the company purchased and added to its property, machinery, dynamos, motors, street-cars, and electrical

apparatus to the value of $50,000, and extended their tracks to the value of $15,000. This material increase in the value of the mortgaged property is also admitted by the demurrer. And it is further said, with respect to such acts, in *Fosdick* v. *Schall*, 99 U. S. 235, on p. 254: "Under such circumstances, it is easy to see that there may sometimes be a propriety in paying back to the income from the proceeds of the sale what is thus diverted from the current debt fund in order to increase the value of the property sold. The same may sometimes be true in respect to expenditures before the ·receivership. No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the Chancellor when he comes to act. The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained."

The rule is restated by the same eminent jurist in *Burnham* v. *Bowen*, 111 U. S. 776, 788, 4 Sup. Ct. 675, 28 L. ed. 596, as follows: "That if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use." There has been no departure in any of the cases cited. It has been adhered to and reaffirmed in them all.

The rule has been applied only to railroad companies, and it is earnestly insisted that a street railway is not within the reason of the rule. It is said to operate in the administration of railroads on account of the public character of such institutions, and upon the assumption that they are of public concern and that a suspension of operation will work an actual detriment to the public. We can not see how the effect of

suspension would be different. Both are transportation companies, both common carriers; and, if suspension in the operation of the one will be an injury to the general public, the suspension of the other will be an injury to the local public, and the difference is one of degree, and not of kind. The doctrine rests upon the principle of mutual benefit to the public, the mortgage and general creditors. If the value of the security is maintained, the system must be kept a going concern, and whatever is essential to this end, in labor, repairs, or equipment, must be protected by the highest degree of confidence to avoid the mischiefs of suspension.

But there can be no restitution where there has been no diversion; that is to say, where there has been no taking of the earnings needed for the payment of current obligations and applied in the betterment of the mortgaged property, there is nothing to be restored. And he who invokes the rule must show affirmatively that the mortgage creditors have got that which in equity belongs to the petitioner. If the mortgagor increases the value of the mortgaged property, from sources other than the earnings, the fact supplies no equity in the general creditor. In this case it is not averred in the petition that the purchase of the electrical equipment, cars, etc., was made from the current earnings of the company, and, for the absence of such averment, the petition must be held insufficient to bring the claim within the rule just considered. *Burnham* v. *Bowen*, 111 U. S. 776.

There is another kindred principle governed by the same general equitable doctrine that must be permitted to operate in this case. Every right the railway company has in the city of Richmond rests upon the franchise ordinance. It has no power to run a car, collect a fare, or encumber its property in any way, except subject to this ordinance. The obligation to pave between its tracks is of the essence of its being, and can no more be laid aside than its duty to pay its debts. It is written in its charter, and inseparable from it,

and when the mortgagees accepted their security, they were bound to take the property as they found it, and bound to know that the rights they acquired in the property were subject to the burdens already imposed upon it. The right the appellants seek to enforce is more than a general claim for money, for it is a right blended with the right of the mortgagor to occupy and use the streets, and one which the mortgagees were required to take notice of and estimate in the acceptance of their mortgage. The liability does not rest upon a claim against the mortgagor, but upon the duty which arises out of the occupancy of the streets.

In *Midland R. Co.* v. *Fisher*, 125 Ind. 19, 8 L. R. A. 604, the owner of land conveyed, in 1873, to a railroad a right of way. It was incorporated in the deed, as a consideration, that the company should construct a board fence on each side of the railroad as soon as completed. The road was completed in 1876. In 1875, the company mortgaged all its property, and in 1883 the mortgage was foreclosed and property sold thereunder. The purchaser entered into possession, and began the operation of the road. No fence had been constructed, and, in 1886, the owner of the land brought suit against the purchaser; and in disposing of the case, the court says: "The appellant is in the possession of the right of way as the grantee of the original contractor, and it must take the benefit it enjoys subject to the burden annexed to it by the contract which gave existence to that benefit. It cannot enjoy the benefit and escape the burden, for the burden and the benefit are so iterlaced as to be inseparable. The right to the benefit is so blended with the burden that equity and justice forbid a severance.

"One who takes a privilege in land to which a burden is annexed has no right to assert a claim to the privilege, and deny responsibility for the burden. A party who acquires such a privilege acquires it subject to the conditions and burdens bound up with it, and must, if he asserts a right to the privilege, bear the burden which the contract creat-

ing the privilege brought into existence.    *    *    *
In *Louisville, etc., R. Co.* v. *Power,* 119 Ind. 269, we said
of a railroad company:   'Holding the land under the deed,
as it did, it was bound to perform its contract.   To permit
it to retain the land and repudiate the deed would be against
equity and good conscience.'

"In this instance the covenant written in the deed was an
essential part of it, and the agreement to construct the fence
was part of the consideration for the land.  The case is near
akin to that of a suit to enforce a vendor's lien; for here the
deed upon its face exhibited the contract, and the facts open
to observation showed that the covenant had not been kept.
The facts open to observation did more than put the appel-
lant upon inquiry; but had they done no more than put it
upon inquiry, it could not justly claim the rights of a pur-
chaser without notice.  It must be held that the covenant in
the deed through which the appellant claims, and the facts
open to observation, imparted notice of the covenant, and
notice also of its non-performance."

As before said, the right does not rest against the person,
but it is affixed to the thing, and the mortgagees, or their
grantees, may not have the thing without the obligation to
discharge the right, for the right runs and abides with the
property wherever it goes.   We think, therefore, that the
petition of intervention exhibits sufficient facts to show that
the charter of the mortgagor company required it to pave
between its tracks, when and as the street was improved, as
a condition to its enjoyment, and that the condition was
carried into appellee's mortgage, and that the claim of the
petitioners, arising thereunder, is paramount to the lien of
the mortgage.

Finally, it is objected that a judgment on demurrer to an
intervening petition is not such a final judgment as may be
appealed from.  The judgment appealed from makes a final
disposition of the case, so far as concerned the petitioners,

Cambria Iron Co. *v.* Union Trust Co.

and was sufficient to warrant the appeal. *Voorhees* v. *Indianapolis, etc., Co.,* 140 Ind. 220.

The judgment is reversed, with instructions to overrule the demurrer of appellees to the intervening petitions of the Royal Brick Company et al., and of the city of Richmond, and for further proceedings in accordance with this opinion.

## ON PETITION FOR REHEARING.

HADLEY, C. J.—Appellees complain that we did not rule upon their motion to dismiss the separate appeal of the city of Richmond.

The motion was filed November, 1897. It was accompanied with no brief, nor was mention made of the same in any of the voluminous briefs filed by appellees on the merits. It therefore escaped our attention.

If, as stated, it is a fact that the city of Richmond did not perfect its separate appeal by filing a bond as of term, or by the service of notice upon parties in vacation, it does not follow that it is not in court. The record shows that notice to co-appellants in Wayne county was given March 20, 1896; and under §647 Burns 1894, the city will be regarded as having joined in the appeal, in the absence of an appearance and declination.

But the record affirmatively shows that the city of Richmond did appear and assign errors and on March 24, 1896, filed a brief in support thereof. This appearance cured all defects in the matter of notice, if any existed, and was sufficient to give the court jurisdiction. *Truman* v. *Scott,* 72 Ind. 258; Ewbank's Manual, §164, and cases cited; Elliott's App. Proc. §146, and cases cited.

Petition for rehearing overruled.