## WELCH & COMPANY, Complainant,

### *v.*

## CENTRAL SAN CRISTOBAL, INC., Dft.

---

San Juan, Equity, No. 940.

GENERAL CREDITORS' BILL.

Collateral—Another Debt.

    1. Where a creditor receives collateral to one debt, he cannot, except by agreement, retain it as security for another debt, until the original obligation has been discharged.

Colonos' Notes—Proceeds in Hands of a Receiver.

    2. When colonos' notes, evidencing advances to sugar cane planters, which are security in the hands of a creditor, are delivered by them to the receiver of the insolvent corporation, and are realized on in due course of administration, the proceeds constitute a separate fund and belong to the creditor as fully as did the notes.

Agricultural Loans—Lien.

    3. Agricultural loans under §§ 1823 and 1824 of the Civil Code of Porto Rico, arising under statute, are *stricti juris*, and the money must be shown to have been used for agricultural purposes.

Agricultural Loan—Act of 1910.

    4. In order to create a lien, an agricultural loan under the act of

Welch & Co. v. Central San Cristobal.

March 10, 1910, must be by definite contract and recorded, and suit must be brought within six months.

Current Debt Fund—Limitation.
   5. The current debt fund originating in the case of Fosdick v. Schall, 99 U. S. 235, 25 L. ed. 339, has been limited to diversion of income within six months previous to receivership.

Promoters—Tracing Fund.
   6. Where a creditor advances money to promoters of a reorganized corporation, he is allowed a lien on the property of the new concern, purchased with his money, unless the rights of bona fide purchasers for value intervene.

Tracing Fund—Other Creditors.
   7. A finding that a creditor has a lien for his money traced into the property of a corporation is not conclusive of its rank in comparison with other claims against the corporation.

Opinion filed May 4, 1915.

---

## Statement of facts.

The bill was filed in this case August 14, 1913, and alleges that the complainant is a corporation organized under the laws of California, and is a citizen of that state, with its principal place of business in San Francisco. That the defendant is a corporation organized under the laws of Connecticut, and is a citizen of that state. That complainant is a creditor of the defendant in the sum of over $974,000, all past due and unsecured except $200,000. That the bill is brought also on behalf of all creditors who may join. That this is a proceeding ancillary to a bill of complaint by complainant against the defendant in the district court of the United States for the district of Connecticut, and the bill in the Connecticut court is made an exhibit to the bill herein, and is adopted as a part

VII. Porto Rico—46.

thereof. Defendant answered in the main suit and the answer
is annexed to the bill at bar. That on August 7, 1913, a bill for
ancillary relief was brought against the said defendant in the
district court of the United States for the southern district of
New York, which defendant also answered. That in both suits
receivers were appointed. That a large part of the property of
the defendant is in this district of Porto Rico, consisting main-
ly of a sugar plantation, mill, machinery, railroad, rolling stock,
cattle, the rights of way, contracts, and personal property, and
it is essential that it should have a receiver within this jurisdic-
tion, and accordingly the bill prays that Alexander R. O'Neill
be made such receiver. The Connecticut bill made an exhibit
sets out in detail relations between the two parties, alleging
that the assets of the defendant at a fair valuation are not more
than sufficient to pay its debts if properly managed.

The bill was answered August 16, 1913, therein admitting all
allegations and consenting to the appointment of the receiver.
On August 16, 1913, Alexander J. O'Neill, one of the receivers
in the main suit, was appointed receiver with a bond of $50,000,
and directed to take charge of the property of the defendant
within the jurisdiction. Defendant and all other persons were
enjoined from instituting any action against the receiver or
property of the defendant. It was further ordered that no prop-
erty of the defendant except merchandise shipped in the regu-
lar course of business should be removed from the jurisdiction,
unless the district court in Connecticut should make an order
accepting claims of creditors residing in Porto Rico when duly
proved before a special master herein, and appointing John M.
Dabney such local master.

There was an order made for the presentation of all claims

against the defendant company, and under this a number were filed, by petition or otherwise. One of the creditors made a party to this suit was the United States Mortgage & Trust Company, which claimed to represent a certain mortgage made by the defendant company in 1910, and another was a petition of intervention of Walter A. Simonds, filed July 20, 1914, claiming under a certain trust agreement of July 1, 1910, and other papers relating to personal property. In accordance with the above order of this court, all claims were referred to the master, John M. Dabney, and he has from time to time reported different claims, and, on exceptions, they have been investigated and disposed of by the court.

Among the last creditors to file proof of verified claims was the complainant Welch & Company. On July 13, 1914, they filed a detailed statement of their dealings with defendant Central San Cristobal, Inc., amounting in effect to a more detailed statement or an amendment in details of their bill as originally filed. To it are annexed, amongst other exhibits, a list of colono notes and a copy of crop lien to the Royal Bank of Canada. By consent of parties the claim of Welch & Company has been heard by the court direct without reference to the master. Hearings were had and much testimony taken on October 20, 21, and 30, 1914, January 7 and on other dates in January, 1915, and depositions and exhibits from New York are also in the file. The present decision is confined to this claim and has no reference to the relative priorities of proved claims.

*Messrs. Hart & Tompkins* and *H. G. Molina* for complainant.

*Mr. W. N. Landers* for defendant San Cristobal.

*Mr. Charles Hartzell* for receiver O'Neill.

HAMILTON, Judge, delivered the following opinion:

This suit is a creditors' bill designed to subject property to claims of the complainant, Welch & Company, a California corporation, and also to those of all other creditors who may come in and make themselves parties in the usual form. The facts proved under the bill may be summarized as follows: Questions arise as to the validity of the complainant's claim and as to those of others. These will be separately considered. And there is, on the other hand, the question of what assets are subject to whatever claims are held to be valid. The defendant corporation, the Central San Cristobal, Inc., made a mortgage which the trustee is seeking to foreclose in the suit of the United State Mortg. & T. Co. v. Central San Cristobal, No. 947, [ante, 693] which has been combined with the suit now at bar. This mortgage is attacked by Welch & Company, one of the present defendants, in that other branch of the case. The validity of that mortgage is passed upon in a separate opinion, and will not be discussed in this.

Welch & Company set up several liens or preferences. Their total debt is proved to have been $976,818.13, but it is made up of different items, and to some extent these stand upon independent transactions. It will be necessary, therefore, to discuss them all in detail.

By way of summary of facts shown in the two cases, it may be noted that the beginning of the Welch dealings with the San Cristobal enterprise was in March, 1910, when defendants Mumford and Church borrowed $300,000 from Welch to buy out others in interest. The present defendant, Central San Cristobal, Inc., was then organized. In addition to that initial

Welch & Co. v. Central San Cristobal.

advance, Welch seems to have made in 1911 a further advance of $100,000. How far the mortgage is affected by these loans is discussed in case No. 947.

The next year Welch & Company made a further advance of $150,000 to carry the enterprise over what is called the "dead season," that is to say, the period after the grinding of a crop and before the harvesting of the next crop. Welch & Company declined to advance any more, but it became necessary in the judgment of the San Cristobal people to obtain more money. On October 26 of this year, therefore, they obtained from the Royal Bank of Canada the sum of $115,000. This was paid down to some extent, but in May, 1913, the balance and the collateral was assigned by the bank to Welch & Company. This is one of the large items and most contested points in the case, and will be taken up first.

1. The evidence shows that originally the Royal Bank of Canada had financed the San Cristobal enterprise, letting it have money from time to time. In May, 1913, the defendant Central San Cristobal, Inc., was indebted to that bank in the amount of $70,734 with interest. The bank held as security certain colono notes, a crop lien, ninety first mortgage bonds of the defendant, and two hundred and fifty-eight shares of the capital stock of a company known as the Alegrias Land Company. The bank wished payment of the claim, and the defendant was unable to satisfy it, and asked Welch & Company to act in the matter. Welch & Company, accordingly, bought the claim of the bank, and they have since that time received the proceeds of the 1913 and other crops, far exceeding the balance due the Royal Bank of Canada. The question is, Does this extinguish the claim and make Welch & Company responsible over

to the defendant Central San Cristobal, Inc., for the securities above named remaining in their hands?

The rule is that, when one receives collateral to one debt, he cannot retain it as collateral to another debt when the original obligation has been discharged. Jones, Liens, § 66. There is a local law on the subject which must be taken into account. Section 1767 of the Civil Code provides:

"A contract of pledge gives a right to the creditor to retain the thing in his possession or in that of the third person to whom it may have been delivered until his credit is paid.

"If, while the creditor retains the pledge, the debtor should contract with him another debt demandable before the first one has been paid, the former may extend the retention until both credits are paid him, even should it not have been stipulated that the pledge should be subject to the security for the second debt."

It is claimed by Welch & Company that they come within the provision as to "another debt," in that the central was largely indebted to Welch & Company otherwise. The wording of the law, however, is that this "other debt" must have been contracted after the one to which the securities were made collateral. The law seems to imply that, unless otherwise defined, it will be presumed that the second loan was on the strength of the first collateral. In the case at bar, however, it does not appear that there was any new advance by Welch after May, 1913, when he took up the Royal Bank of Canada claim. The case might be altered if the arrangement under which Welch & Company took up this claim embraced holding the securities to cover prior advances. But this does not appear. The resolution of May 20, 1913, seems to relate to the Royal Bank balance alone.

Welch & Co. v. Central San Cristobal.

What appears in the minutes of the defendant corporation would not be binding upon Welch, but it may be of value in determining what was in the minds of the corporation, inasmuch as the corporation must act through its directors. When Welch took over the bank claim the minute entries show no change in the contract. On May 20, 1913, the action of the officers in arranging that Welch should take over the bank claim and the collateral for the same, as it is expressed, was ratified. On June 19, 1913, this action of the officers is again mentioned and approved. In no place is there expressed any broadening of the collateral agreement, any understanding that the collateral is to secure anything except the original bank claim.

The facts seem to be that the parties agreed for Welch to take up what was a pressing obligation, and, either expressly or impliedly, that Welch should step into the shoes of the Royal Bank of Canada. It must be concluded, therefore, that, as the Royal Bank of Canada had no claim other than that of $70,734, which Welch paid off, Welch & Company cannot hold the securities obtained from the Royal Bank of Canada after Welch had been repaid that advance. The claim of Welch & Company for a preference on this ground must therefore be denied.

2. There was, on July 30, 1913, delivered direct to Welch & Company by the defendant central $21,600 of other colono notes, as security for the debt due Welch. This was ratified August 5 by a resolution of the directors of the defendant central. This was a separate transaction entirely from that with the Royal Bank of Canada. These notes evidence advances by the central to the planters or colonos, and under the Porto Rican law are a binding obligation upon the canes and resulting sugar produced by these colonos. As the canes are deliverable

—and in this case were delivered—at the central, and there liquidated in sugar which was ground, or · in the equivalent money, it is usual and proper that the notes, although belonging to Welch, should be handled and collected by the receiver in this case. It has heretofore been ordered that he hold this fund separate. The proceeds belong to Welch & Company as fully as did the notes. This is not so much an instance of tracing one's own property into a fund, as of an officer of the court holding a fund directly resulting from the collection of the property of Welch & Company.    Welch & Company are entitled to the proceeds of these notes, which seem to amount in· the receiver's hands to $26,219.86. This fund has been held by· the receiver on a separate account from the other money realized from the receivership under order of this court in 1914.. The receiver will pay this over to Welch & Company.

3. Welch & Company further claim that a part of their indebtedness should be preferred under the Civil Code of Porto· Rico as to agricultural loans. This claim is set up under the· Civil Code, §§ 1823, subdiv. 6, and 1824, subdiv. 6, which are· as follows: .

"Sec. 1823.   With regard to specified personal property of· the debtor, the following are preferred:

"6. Credits for seeds and expenses of cultivation and har-· vesting, advanced to the debtor, with regard to the fruits of the· crops to which they were applied."

"Sec. 1824. With regard to certain real property and rights· on realty of the debtor, the following shall have preference:

"6. Agricultural loans not entered or recorded with regard' to the real estate to which the agricultural rate (refacción) re-

Welch & Co. v. Central San Cristobal.

lates, and only with regard to other credits from that mentioned in the four preceding numbers."

The origin of this transaction was the advance by Welch July 3, 1912, of $150,000 to carry the enterprise over what is called the "dead season" between crops. The receiver's evidence shows that the property of the central was about that amount more valuable after this advance than it was before, and Welch contends that it must have come from the Welch advances, as there was no other source except the Royal Bank of Canada, and even this Welch took up.

This court recognizes the liens given by the local law and enforces them in proper cases. This has come up repeatedly in bankruptcy matters. It is to be remembered, however, that they are *stricti juris,* as they arise under statutes, and therefore the provisions of the statute must be substantially carried out. As to agricultural loans, the statutes above cited provide that the loan must be made for agricultural purposes, must be used for such purposes.

As to the contract itself, the evidence shows only that the advance was made to carry the central over the "dead season" between crops. This would fairly embrace everything connected with the business of the central from July to December. As there is no other source of income shown to exist during that period, except a subsequent loan from the Royal Bank of Canada, the conclusion is fair that the money was used for those purposes. All of these expenditures are not clearly shown by the evidence, however. Certainly the payment of $17,500 for interest cannot in any sense be held to be an agricultural loan, and it will be difficult from the evidence to figure out what did go for strictly agricultural purposes. This is a matter which

must be shown by the complainant and cannot be inferred.   The
two sections of the Civil Code above quoted seek to classify the
debts of a debtor.   They would apply in equity in a creditors'
bill such as the one at bar.   It is to be noted, however, that §
1823 applies only with regard to specified personal property
of the debtor, and relates to credits for seeds and expenses of
cultivation and harvesting advanced to the debtor, and is limited
to the fruits of the crops to which the advances are applied.

The next section is similar, and has regard to the real prop-
erty of the debtor, where the agricultural loan is not entered
or recorded with reference to the real estate to which it relates.
This latter is specifically made inferior to mortgages and agri-
cultural advances.

It is not fairly shown by Welch & Company that any money
or its proceeds now in the hands of the receiver came from the
crops advanced for by the $150,000 loan in July, 1912.   Nor is
it shown that this loan amounted to an agricultural loan on
particular realty, although not entered or recorded.   It is to be
noted that these sections do not purport to give any lien.   They
merely give the order in which payments shall be made in ordi-
nary cases, and are almost the last in the scale in each instance.
The next section allows preferences according to the dates of
instruments and judgments, but does not include the items above
mentioned.   Section 1826 distinctly says that credits not in-
cluded in the preceding section shall have no preference.   Suc-
ceeding sections fix the priority of payments of credits, but they
relate to property which is specified in the obligation or credit.
The preference which is mentioned in § 1825 as to advances
for agricultural purposes is said expressly to be governed by
the special act relating to that subject.   It does not appear, there-

fore, that the complainant has established any lien or preference under these sections.

4. The matter of agriculture is so important in Porto Rico that there are several provisions of the law invoked. Thus, an act was passed March 10, 1910, making more specific the loan and lien for agricultural purposes. Of this act §§ 1 and 4 read as follows:

"Section 1. A contract of advances for agricultural purposes is one under which one of the parties thereto turns over and the other party receives, subject to reimbursement, a certain amount of money in cash or species, whether in a lump sum or in successive instalments, with which to meet the expenses of administration, maintenance, cultivation, or improvements of rural properties, the products of said properties being answerable and liable for the repayments of the amounts so received, with interest agreed to thereon.

"The installation and restoration of buildings and machinery for agricultural and industrial purposes in connection with plantings within the area of the property may be comprised in the contract as an object thereof."

"The parties, furthermore, may set forth in the contract such legal covenants as they may deem proper."

"Section 4. The indebtedness of advances for agricultural purposes, from the date of the filing thereof in the registry hereinafter provided for, shall have preference over all other subsequent indebtedness of whatever nature, as to the crops raised on the property for which the advances are made, during the term of the contract, and always until the creditor shall have been fully paid for the total sum of his advances, except indebt-

edness for taxes in favor of the People of Porto Rico as provided
by law.

"Where the creditor has not been fully paid for the amount
of his credit during the term of the contract, it shall be the duty
of such creditor to enter into a contract for the extension of such
term with the debtor, or bring suit as provided in § 9 hereof,
within six months after the expiration of the contract."

It is claimed by Welch & Company that the trustee under the
mortgage had no lien on the crops, and that the proceeds of the
crop should go to Welch under this law. It is provided above
that such a claim shall be recorded, which was not done in the
case at bar; but Welch seeks to obviate this objection by saying
that the provision is designed only to protect subsequent cred-
itors, and that the trustee was not a subsequent creditor. His
mortgage of 1910 certainly antedated this advance of 1912. A
reading of the law of March 10, 1910 (Laws of P. R. 1910,
p. 119) shows that the legislation was intended to secure definite
contracts either by public instrument or private document sub-
scribed before a notary public, which must contain a description
of the property, and be otherwise assimilated to formal con-
tracts. A letter agreeing to furnish $150,000 to carry a central
over the "dead season" is not in form such a contract. The per-
son alleging a claim under this law must show that he comes
fairly within its terms. This, however, has not been done by
Welch.

Apart from the informality of the contract, it has not been
presented within the time required by this law. The statute
requires that unless the contract is extended suit must be brought
within six months. This would mean either six months from
the making of the advances,—in this case July, 1912,—or six

months from the application of the fund, which would seem to have been exhausted before January, 1913, because other money was in October, 1912, borrowed from the Royal bank of Canada. The six months therefore expired, in any event, by the spring of 1913, and no suit was brought. The complainant seeks to excuse himself in this regard by saying that the injunction which accompanied the receivership prevented him from bringing suit. But this suit was filed August 13, 1913, and the receiver appointed two days later, and thus after the six months' period. It is immaterial, therefore, whether there were any items coming within the provisions of the agricultural loan law or not. If they cannot be recovered it will be useless to investigate what items would have come within the law. It follows therefore that the plaintiff has not made out this branch of his case.

5. Apart from the special statutory liens discussed, Welch & Company appeal to the general equity jurisdiction of the court in regard to their claim against the Central San Cristobal properties. They allege that their money went into the different properties now in the hands of the receiver, and that, as they can so trace it into the fund or property in question, they are entitled to have a lien declared in their favor. One of the equities so set up is that there was on December 21, 1912, $17,-500 paid by the defendant company as interest on the mortgage in suit, which money Welch claims was derived from the fund advanced by them. This claim comes up on the principle of diversion of income, originally in Fosdick v. Schall, 99 U. S. 235, 25 L. ed. 339. It has since been elaborated in Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365, 27 L. ed. 419, 2 Sup. Ct. Rep. 257; Burnham v. Bowen, 111 U. S. 776, 28 L. ed. 596, 4

Sup. Ct. Rep. 675; and Kneeland v. American Loan & T. Co.
136 U. S. 89, 34 L. ed. 379, 10 Sup. Ct. Rep. 950.

It would seem that this claim does not come within the time
which has been prescribed by these different cases. It was
perhaps arbitrary to fix a period of six months within which to
force such claims and exclude some equally meritorious previous
to six months. However, the six months' period before receiver-
ship has been fixed, and, if there should be exceptions, at all
events the case at bar does not seem to call for such exceptional
treatment. The receivership in this case was not until August
13, 1913, and, therefore, the diversion of income to pay De-
cember interest on the mortgage, if it occurred, was more than
six months before the receivership.

6. The validity of the mortgage is attacked by Welch in case
No. 947 [ante, 693]. It is contended by Welch in the case at
bar that he can trace into the property of the defendant com-
pany the money which he loaned prior to the mortgage, and
that, therefore, he should be protected to that extent. This
amounts to $300,000.

The facts proved to the satisfaction of the court are that
in the three original San Cristobal corporations there developed
a hostility between owners which threatened their usefulness,
and that P. G. Mumford, one of the owners, obtained from
Welch this sum of $300,000 in order to buy out his opponents.
Welch contends that the reorganization was so effected that
nothing was paid except this amount of money, and that all
parties now interested secured their holdings without cost.

The proof seems to show that after Mumford borrowed $300,-
000 from Welch, he bought out his old associates with $392,000
of the new bonds, and made a clear profit of the remaining

Welch & Co. v. Central San Cristobal.

$108,000 of these bonds. The latter sum he paid into the treasury of the new company in payment for stock then issued to him. This was not all he paid in, for he also turned in the bonds which he obtained as his share of the old company. By the investment of these two blocks of bonds, however, he obtained control, and has remained the controlling factor in the defendant Central San Cristobal, Inc. There is no proof that the associates so bought out participated in the fraud, if there was any. The only scope for fraud in the transaction was that the money of Welch can be traced into the new property in such a way as to make the new property a kind of trust fund in the hands of Mumford or his privies in estate. For instance, Welch & Company obtained, through the Royal Bank of Canada, some ninety bonds of the new corporation, and would seem to be entitled to subject these to their claim, not because of the contract with the Royal Bank of Canada, but because they have, as above stated, traced their money into the reorganized corporation, whose principal representative is found in the first mortgage bonds, but the same is not clear of the other assets in the hands of Welch which came through the Royal Bank of Canada. It is not a question at present whether the defendant company owes Welch, but whether property which came to the receiver's hands is shown to be the proceeds of money advanced that defendant by Welch.

As to the dealings between Welch and the defendant corporation, some light is thrown by the minutes of the corporation. On April 7, 1913, it is noted that the debt was at that time about $700,000 and there were negotiations for securing it. Until this should be effected, it was arranged that Welch should hold 6,000 shares of the stock of the corporation. So far as the

minutes show, this arrangement was never changed.   This would
imply that there was no agreement for an agricultural loan.
There is no entry of any further arrangement as to collateral
for the main debt.   On June 19, 1913, the arrangement as to
Welch's acting as sales agent of the company was extended from
five years to ten, and commissions increased from 1 per cent to
.2 per cent; so that it would look as if Welch was not unaware
of the general condition of the company and hoped to recoup
himself by increased commissions.   This stock was donated by
the different stockholders.   On May 21 comes the resignation
of Mumford as president, treasurer, and assistant secretary, and
no mention is made of his successor.   The last entry in the
minutes is under date of August 5, 1913, which recites that the
company has been notified by Welch of his intended bill for
receivership, a copy of which is ordered spread upon the
minutes, and the officers are directed to admit the allegations
and co-operate in the suit.   This was the bill filed in the United
States court in Connecticut, and shows, on Welch's part, a full
knowledge at that time of the mortgage, and seeks relief only as
to assets not covered by that instrument.

The evidence is not clear as to all details, but the testimony
was not taken with knowledge of the views of the court as to the
law, and it may be better to allow further testimony to be taken
on this point.

7. This is not to be construed as deciding on the relative
priority of Welch and the other creditors of the defendant
central.   The present finding is merely that Welch is entitled
to priority for whatever can be traced into the existing assets of
the reorganized concern.   What amount of assets remains to be

Welch & Co. v. Central San Cristobal.

so subjected, and how this preference ranks in regard to other preferred claims allowed or to be allowed by the court, is a question which cannot now be decided.

A decree will be prepared and entered passing on the claims of complainant allowed or disallowed as above, and ordering a reference as to other parts, all in accordance with the above opinion.