CARROLL et al. v. FIRST NAT. BANK OF PANAMA CITY, FLA.

No. 5675.

Circuit Court of Appeals, Fifth Circuit.

Feb. 25, 1930.

196

Wm. H. Watson, of Pensacola, Fla., and Mike Sollie, Sr., of Ozark, Ala. (Sollie & Sollie, of Ozark, Ala., and Watson & Pasco & Brown, of Pensacola, Fla., on the brief), for appellants.

Byrd G. Farmer, of Dothan, Ala., and Francis B. Carter, of Pensacola, Fla. (Carter & Yonge, of Pensacola, Fla., and Farmer, Merrill & Farmer, of Dothan, Ala., on the brief), for appellee.

Before BRYAN and FOSTER, Circuit Judges, and SIBLEY, District Judge.

SIBLEY, District Judge.

The bill of complainants, now appellants, was dismissed on the ground that it set forth no basis for relief in equity, and no cause of action at law if transferred to that side of the court. Much condensed, it alleges that complainants, as cotton merchants, during April, 1925, on orders from W. B. Glenn, as manager of Ozark Cotton Mill Company, placed upon the premises of the company for delivery to it when paid for three lots of cotton, consisting of thirty-eight, forty-six, and twenty-five bales, respectively. They had refused to sell except for cash, and it was agreed that title should not pass to the cotton until paid for. Drafts drawn on respondent, First National Bank of Panama City, were given for the price of the first two lots, but no draft was given for the third lot because it was not yet complete. The two drafts were dishonored by the bank, and complainants thereupon sought to retake the cotton, but found that all except ten bales, which they got, had been opened and mixed with other cotton and put in process of manufacture, so that it could not be distinguished. A mortgage on the plant of the cotton mill company was then in process of foreclosure, held by the First National Bank of Birmingham. The plant was closed down about May 1, 1925. The mill company's assets of all sorts were taken by mortgages, leaving it wholly insolvent and the complainants without remedy against the company. The connection of the respondent, First National Bank of Panama City, with the situation was this: In June, 1923, it had assisted in getting the mill company out of bankruptcy by a composition, as a result of which the bank had a mortgage to secure advances made and to be made to the amount of $30,000, which covered all the company's cotton on hand and to be acquired, products manufactured and in course of manufacture, deposits of money, and accounts receivable, present and future, all for a period of two years to come. The mortgage was duly recorded. The mill's plant was covered by a first mortgage to the First National Bank of Birmingham, and a second mortgage to the directors of the mill company. The business proved again unsuccessful, and in September, 1924, a further arrangement for credit was made with the First National Bank of Panama City, whereby it agreed to furnish additional money for operation. By the contract the former mortgage was ratified. The directors assigned their second mortgage on the plant to the bank as additional security. W. B. Glenn was agreed to be put in the mill as general supervisor to run it; all the products, accounts, and funds of the mill company were "bargained, sold and conveyed" to the bank as fast as they should arise, as security for all indebtedness to the bank; all money and collections were to be there deposited and kept: "Provided, however, that from time to time W. B. Glenn, as general supervisor of said Ozark Cotton Mill Company, shall pay the necessary expenses for the operation of said plant, and for same shall draw his draft or check on the First National Bank of Panama City, Florida, with voucher for same attached, showing the items, with value, for which such check is drawn." Glenn informed complainants of this arrangement, and prior to April, 1925, for many months cotton had been sold and paid for in accordance with it. Glenn managed the mill directly under and subject to the advice and control of the bank, and carried out the agreement as to the handling of its funds. The bank knew the financial condition of the mill, and that it had no funds to buy cotton with save those in the bank. When it turned down complainants' drafts for cotton in April, it knew the mill was being advertised for sale, and would be sold about May 1st. The bank actually got all the proceeds of the yarns made by the mill during April, including those made from the cotton of complainants, the proceeds amounting to more than the value of the cotton and more than the entire cost of producing the yarn. Discovery is prayed, and an account of the proceeds of the cotton and a decree for its value.

We think the case calls for equitable relief. It would be too much to say that it appears from these allegations that Glenn was the agent of the bank in buying cotton, so that the bank became directly bound for its price, or that he was such in converting it before its final delivery, thus rendering the bank directly liable for his act. Neither can we say the bank expressly promised to pay all Glenn's drafts in such a way as that complainants could sue upon the promise. If any of these things were true, there would be an adequate remedy at law. But we think the situation and its outcome entitle the complainants to relief in equity. The bank was an active party to the arrangement whereby the mill was to be run by drafts drawn against the products for expenses and supplies, and it was to be the beneficiary of any net profits. The fair meaning of the contract was, not that Glenn should buy supplies and turn the products over to the bank without paying for the supplies, for that would have been fraudulent in its inception. The intention was that there should be an honest operation by paying current debts of all sorts. The implication of such an intent is at the bottom of the idea of the "current debt fund" in dealing with insolvent railroads whose income has been mortgaged. Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339. Had this situation arisen without the bank's actively contributing to it, it may be that it could have enforced its mortgage if legally valid, and secured priority under it. But here, with the knowledge of the impending closing of the mill, and that the bank would get all the products that could be turned off before the closing, and that the presented drafts were for cotton which would thus come to it, and that it had been sold in probable reliance on the operating arrangement with the mill, the bank could not honestly dishonor the drafts and keep the cotton and the products for itself. It is a case of confidence justly reposed and abused, to remedy which equity will construct a suitable trust. The proceeds of the yarns into which the cotton of complainants entered should be accounted for, and the contribution thereto of complainants' cotton ascertained and complainants' pro rata part therein paid to them. In the absence of intentional fraud, the contributions made by the bank itself to the fund have an equal standing. If the manufacture was not at a loss, the fund will suffice to pay in full all direct contributors to it.

One of the grounds urged for dismissal of the bill was that Ozark Cotton Mill Company is not a party, and, being a citizen of the same state with complainants, could not be joined without ousting the jurisdiction. It is alleged that this corporation has been wholly insolvent, out of business, and defunct for nearly five years. It has no interest in the fund to be raised and administered. Though a proper party, it is not an indispensable one. Shields v. Barrow, 17 How. 130, 15 L. Ed. 158. The bill should have been retained for trial.

Reversed.